RECTOR-PHILLIPS-MORSE, INC. v.
HUNTSMAN FARMS, INC. et al

CA 79-132                                    590 S.W. 2d 317

Opinion delivered November 14, 1979
Released for publication December 5, 1979

*James M. McHaney* and *John C. Calhoun, Jr.,* for appellant.

*Wright, Lindsey & Jennings,* for appellees.

GEORGE HOWARD, JR., Judge. The central issue tendered for determination is whether the trial court committed error in denying appellant's claim to a commission purportedly earned as a consequence of producing a buyer who was ready, willing and able to purchase real estate from appellee pursuant to an agreement between the parties.

The pertinent facts are: Sometime during July, 1976, Robert Chowning, Executive Vice President of Rector-Phillips-Morse, Inc., hereinafter called Rector, Inc., was advised that Sidney Weniger was interested in buying the Riviera Apartments which are located on Old Cantrell Road in Little Rock. The apartments were purchased by Harold Huntsman and his wife in 1973 from Rector-Phillips-Morse Realty Fund, a limited partnership and a subsidiary of Rector, Inc., hereinafter referred to as Realty Fund; and Huntsman later conveyed the property to Huntsman's Farm, Inc. A third mortgage was executed, on the apartments, by Huntsman in favor of Realty Fund to secure a note for $584,000.00 which was to mature on September 15, 1976.[1]

On August 4, 1976, Andy Agar, a representative of Rector, Inc., confirmed Mr. Chowning's telephonic conversation with Mr. Huntsman by letter and the communication further stated: "Should a sale be made by you to Mr. Weniger, we feel you should not enter into direct negotia-

---

[1] Rector, Inc. managed the apartments for Mr. Huntsman under a five year contract.

tions with Mr. Weniger without our being involved. In any event, and should you sell the property to Mr. Weniger, this is to advise you that we will consider ourselves entitled to commission of 6% of the total sales price."

On September 16, 1976, Mr. Huntsman and Mr. Weniger entered into an offer and acceptance agreement which provided, among other things: (1) The total sales price would be the outstanding principal balance due on mortgages involving the apartment, plus $150,000.00 cash to the seller, and (2) the agreement is subject to a special condition on Weniger closing a satisfactory mortgage loan to be obtained from First Federal Savings & Loan Association of Pine Bluff, Arkansas. Finalization of the transaction was scheduled for October 31, 1976. The offer and acceptance agreement also specified that "Seller agrees to pay Rector-Phillips-Morse, Inc., agent, a commission pursuant to the agreement between them." While the offer and acceptance agreement was executed on a printed form of Rector, Inc., the agreement was executed by Mr. Weniger and Mr. Huntsman and no one from Rector, Inc. was present during the execution of the agreement.

A rider, dated the same date as the offer and acceptance agreement, was executed, by Huntsman and Weniger, and attached to the agreement. The rider, in material part, provides:

1. On or before December 31, 1976, if title has been acquired by Buyer to the Riviera Apartments, the Seller shall have the option upon 15 days notice to re-purchase said property by assuming any new mortgage financing arranged by the Buyer. (If satisfactory to lending institution) and any existing mortgages, which Buyer may have assumed at time of title, plus the payment to the Buyer of the following.

. . .

3. In addition, Seller shall pay to Buyer, the sum of $45,000.00 plus a sum equal to one percent of the amount of new financing arranged by Buyer.

If said new mortgage financing does not exceed nine (9) percent interest, Seller shall pay Buyer an additional sum of one (1) percent of said mortgage.

If said new mortgage financing is more than a 25 year term, Buyer shall pay Seller an additional sum of one (1) percent of the mortgage.

4. It is the express interest of this option agreement, that if exercised by the Seller, the Buyer shall be reimbursed for any and all out-of-pocket costs incurred by Buyer (or nominee) in connection with or on behalf of the purchase, financing, and closing of title to the Riviera, its operation from date of title to date of repurchase, plus the sums referred to in paragraph 3 above.

On September 24, 1976, an addendum to the agreement was executed by Weniger and Huntsman which provides in relevant part:

1) As an alternative to assuming the new mortgage as set forth in paragraph 1 of the Rider, seller may pay the same in full, including any prepayment penalties.

. . .

3) In the event seller pays the mortgage held by RPM Realty Fund in full prior to closing date of this transaction and pays to buyer the sum of $45,000 plus all costs and expenses incurred on account of this transaction (including legal fees, appraisal fees, mortgage application fees, etc.) buyer agrees to void the offer and acceptance and Rider dated September 16, 1976[2] and to release seller from all obligations thereunder.

Mr. Weniger testified that he had made arrangements

---

[2] Rider 2 (addendum) was executed by Huntsman and Weniger purportedly on September 24, 1976, after Huntsman had consulted his attorney with reference to the offer and acceptance agreement and Rider 1. Huntsman was told by his attorney that "there were some things left out." Weniger was consulted and Rider 2 was executed.

with First Federal Savings & Loan Association of Pine Bluff, Arkansas, for financing the purchase of the apartments, but when First Federal became aware of the stipulation in the offer and acceptance agreement that Huntsman had the option of repurchasing the property and assuming the mortgage, First Federal refused to agree to the stipulation. Moreover, First Federal stated that it did not want Huntsman as a mortgagor under any circumstances. Consequently, Weniger's arrangements with First Federal for financing the purchase of Huntsman's apartments did not materialize.

On or about October 28, 1976, Huntsman deeded the apartments to Graceland College, an Illinois Institution sponsored by the Church of Jesus Christ of Latter Day Saints; and on October 31, 1976, Graceland College paid off the third mortgage held by Realty Fund. In November, Weniger filed his specific performance action against Huntsman and Graceland College. Rector, Inc. intervened in the action seeking to recover a commission of $75,000.00.

The trial court found that while Rector, Inc. was not afforded a general listing, Huntsman did agree to pay Rector, Inc. a commission, providing the apartments were sold to Sidney Weniger. The trial judge concluded the property was not sold to Weniger, therefore, Rector, Inc. did not produce a ready, willing and able buyer for the property. Consequently, the trial court dismissed appellant's complaint with prejudice.

Appellant's argument for reversal may be summarized as: That appellant has established, by a preponderance of the evidence, that Weniger and Huntsman were brought together by appellant; that this meeting culminated in an agreement acceptable to the seller, Huntsman. Hence, appellant earned its commission effective September 16, 1976, the date offer and acceptance agreement was executed; and that the ultimate outcome of the transaction cannot vitiate Rector, Inc.'s entitlement to the commission.

First, it is fitting that we set out the scope and range of our responsibility as an appellate court in reviewing a pro-

ceeding on appeal from a chancery court. Admittedly, such proceeding is tried *de novo*. However, it is clear that an appellate court will affirm the action of the trial court when that court's action is supported by a preponderance of the evidence. *Alley* v. *Martin,* 250 Ark. 74, 464 S.W. 2d 591 (1971); *Summers* v. *Hook,* 243 Ark. 368, 419 S.W. 2d 810 (1977). Moreover, where credibility as between interested parties in an action is pivotal, the appellate court's practice is to abide by the chancellor's judgment in the matter. *Souter* v. *Witt,* 87 Ark. 593, 113 S.W. 800 (1908).

Turning now to the issue to be resolved, we are persuaded that the universal rule provides that a broker is entitled to his commission when he produces a purchaser who is able, ready and willing to buy the property at a price and on terms designated by the seller, although no sale is made. However, this general rule is subject to exceptions. An exception, for example is where the agreement designates the person to whom the sale is to be made. 12 C.J.S., Brokers, Section 85, page 187.

In *El Dorado Real Estate* v. *Garrett,* 240 Ark. 483, 400 S.W. 2d 497 (1966), the Arkansas Supreme Court observed that one thread that seems to be woven in cases rendered by the Court between 1908 and 1963 relative to a broker's commission involving real estate — where a purchaser has been produced who is ready, willing and able to purchase the lands — it is not necessary that an enforceable contract be executed before the broker is entitled to his commission, unless the agreement between the seller and broker calls for an actual sale of the property.

In *Sarna* v. *Fairweather,* 248 Ark. 742, 453 S.W. 2d 715 (1970), the Supreme Court again re-emphasized that a broker earns his commission by producing a buyer ready, willing and able to take the property on the seller's terms, even if the contract were unenforceable, unless the agreement between the seller and agent required that the sale be actually consummated.

Appellant's letter of August 4, 1976, to Mr. Huntsman, which puts Huntsman on notice that appellant expected a

commission for its services provides:

> Should a sale be made by you to Mr. Weniger, we feel you should not enter into direct negotiation without our being involved. In any event, and should you sell the property to Mr. Weniger, this is to advise you that we will consider ourselves entitled to a commission of 6% of the total sales price.

Andy Agar, a representative of appellant, testified that the agreement was that his company would be entitled to a commission if a deal were made with Mr. Weniger.

Mrs. Patsy Akers and George Sisco, who were called as witnesses by appellant, testified that they had heard a conversation between Agar and Huntsman to the effect that appellant would receive a commission if a sale were made with Weniger. On the other hand, Huntsman denies that he agreed to pay a commission to appellant under any circumstances. The trial court, however, concluded that Huntsman did agree to pay a commission only if the property were sold to Weniger.

Appellant argues that Weniger never had an opportunity to consummate the sale inasmuch as Huntsman declared the agreement terminated by virtue of deeding the property to Graceland College. In other words, the failure on the part of Weniger to make a sale was due to the fault of Huntsman. Moreover, appellant argues that Huntsman may not shield himself or take refuge in the circumstances surrounding the failure of Weniger to obtain financing for the purchase of the property through First Federal Savings & Loan Association of Pine Bluff, Arkansas, inasmuch as it was never the obligation or responsiblity of Weniger to obtain a loan from any source; that Weniger had no obligation to arrange financing until expiration of Huntsman's right to terminate the agreement by paying off the third mortgage; that the ''sole and only reason for the transaction not closing was the precipitous conduct of Huntsman.''

On the other hand, Huntsman argues that the special condition contained in the offer and acceptance with refer-

ence to Weniger's closing a satisfactory mortgage loan from First Federal Savings & Loan Association of Pine Bluff, Arkansas, was not a condition tied to financing in general, but to a mortgage loan from a specific lending institution and this becomes most relevant and material to Huntsman when reference is made to paragraph 1 of the first rider which specifies that ''On or before December 31, 1976, if title had been acquired by buyer to Riviera Apartments, the seller shall have the option upon 15 days notice to repurchase said property by assuming any new mortgage financing arranged by the buyer.'' By virtue of the rider, argues Huntsman, he had a vested right to assume the loan from First Federal Savings & Loan Association of Pine Bluff which Weniger intended to place on the apartments; and that this was vital to him because he was negotiating with Weniger for refinance money for the apartments.

It is clear from the record that prior to and during Huntsman's negotiation with Weniger, Huntsman was having financial problems and was faced with the maturity of a note due Realty Fund and which was secured by a third mortgage on the apartments.

Weniger could not acquire the financing from First Federal Savings & Loan Associatin of Pine Bluff since First Federal refused to permit Huntsman to assume the loan.

Given these circumstances, we are persuaded that Weniger's offer was a conditional one and, indeed, it seems clear until this condition was met, Huntsman had no duty to sell, nor Weniger a duty to purchase.

While the trial judge indulged, to a degree, in some mental exercise as to whether the condition relating to financing from First Federal could be waived by Weniger, the judge did not predicate his decision, in any way, on waiver, but concluded:

> . . . I do not believe that the mere filing of the Specific Performance suit, and its allegation of 'ready, willing and able' to perform is, standing alone, sufficient to consitute either a waiver or establish financial ability

to perfect the purchase. Further, I cannot conclude that the mere fact that Mr. Weniger 'owns' other properties in the Little Rock area is sufficient to establish his financial ability.

In other words, the evidence was insufficient to find a waiver of the condition, or that Weniger was financially able to consummate the sale in absence of the funds to be derived from the loan.

We are also persuaded that the contract between Weniger and Huntsman constituted the offer and acceptance, the first and second riders. As a matter of fact, both Huntsman and Weniger testified that the three documents represented the agreement between them and that the second rider (addendum) was executed to simply clarify the terms of the transaction as contained in the offer and acceptance and the first rider.

Under paragraph 3 of the second rider, Huntsman had the right to pay off the mortgage held by Realty Fund and to pay Weniger $45,000.00 plus all cost and expenses incurred; and Weniger agreed to void the offer and acceptance agreement and to release the seller from all obligations. In selling the property to Graceland College, Huntsman exercised this option.

After carefully considering the record, we are unable to say that the trial court's holding is not supported by a preponderance of the evidence.

Affirmed.

HAYS, J., dissents.

M. STEELE HAYS, Judge. I earnestly disagree with the affirmance of this case. True, there was no written listing agreement between the owner and the broker, but a careful reading of the record convinces me that the owner (having indicated his willingness to the broker to sell "if the price is right") permitted the broker to bring him into contact with a prospective buyer and rather promptly thereafter entered

into a written offer and acceptance agreement with the buyer which included a provision plainly recognizing the broker's right to a commission. Under the holding in numerous decisions of the Supreme Court of this state, a broker has earned his commission when the seller accepts the buyer's offer. *Moore* v. *Irwin,* 89 Ark. 289 (1909); *Wales-Riggs Plantations* v. *Pumphrey,* 141 Ark. 565 (1920). The seller argues that this case is distinguishable from those decisions holding that the commission is earned when the broker produces a buyer ready, willing and able for the reason that *here* the terms of the verbal listing carried the special provision that a sale be actually consummated. This argument might be persuasive but for the fact that it was the seller, rather than the buyer, who aborted the closing. *Emerson* v. *Stout Farm Agency,* 161 Ark. 378 (1924); *Chambers* v. *Ester,* 159 Ark. 250 (1923).

I would reverse.

